293 So.2d 823 (1974)
David William CLINGON
v.
STATE of Mississippi.
No. 47902.
Supreme Court of Mississippi.
April 22, 1974.
Rehearing Denied May 20, 1974.
*824 Barnett, Montgomery, McClintock & Cunningham, Jackson, George Dan Martin, Brandon, for appellant.
A.F. Summer, Atty. Gen., by Ben H. Walley, Asst. Atty. Gen., Jackson, for appellee.
GILLESPIE, Chief Justice:
David William Clingon was indicted in the Circuit Court of Rankin County for the murder of Fred Leon Browning and convicted of manslaughter. He prosecutes this appeal, and the principal question raised is whether he was entitled to a peremptory instruction.
Defendant argues that he was entitled to a peremptory instruction under the rule announced in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), which is as follows:
It has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge. 165 Miss. at 209, 147 So. at 482.
The deceased lived with his family in a trailer home in Rankin County. On the afternoon of the homicide, defendant stopped by the Browining home, and he and Browning left to purchase some alcohol. Later they both returned with two bottles of whiskey. An argument developed between defendant and Browning, and Mrs. Browning and her daughter left. Thereafter defendant drove to the home of J.T. Varner and requested Varner to take him to the sheriff's office so that one of the deputies could take him to a doctor. Clingon gave Mrs. Varner a 38-caliber pistol which contained three rounds of live ammunition and three empty hulls. Clingon stated that he had been shot, although his wounds consisted only of deep scratches on his stomach. There were holes in each side of his zipper jacket and one hole in his shirt. Defendant then went to the jail and thence to the hospital where a nurse bandaged his wounds.
During the investigation that followed, the body of Browning was found in his bedroom which is at the end of a hall. Immediately in front of the bedroom entrance are a bathroom on the left side of the hall and a back door to the trailer on the right side. The hall is two feet wide. Browning was lying face down with his head toward the rear of the trailer. Near the doorway was a shotgun pointed toward the hallway with a spent shell in the barrel. A live shotgun shell was on the floor nearby. On the side of the hall opposite and down from the bathroom door was a hole in the wall made by the pellets from a shotgun, and in this hole were fragments of cloth, presumably part of defendant's zipper jacket. Two spent 38-caliber bullets were found in the bedroom, and another was lodged in the bedroom wall.
Browning had been shot three times, and there were powder burns around the two wounds on his chest. The first bullet entered in the buttock below the hip line, traversed through the soft tissue of the buttock, and exited to the left of the mid line still in soft tissue. The angle was toward the center of the body and down. The second wound, which was probably the fatal wound, went through the heart and the lung before it exited. The angle was almost a straight shot perpendicular to the vertical position of the body. The maximum time that a person could live after sustaining that wound would be fifteen to thirty seconds. The third missile entered the right side of the chest and exited below the rib cage on the left side. This wound was at a downward angle and would also have been fatal if he had not received almost immediate attention. Browning was essentially dead when this third wound passed through his body.
*825 The pathologist determined that the shot in the hip was the first by reason of the fact that the blood had been pumped out from the missile track, indicating the heart was pumping blood at the time the wound was inflicted. The pathologist's opinion as to the sequence of the three shots was based on the amount of bleeding related to the track of the missiles and the fact that the heart did not pump after it was penetrated by a bullet. The shot entering the right side of his chest caused a minimal amount of hermorrhage along the missile track, indicating that the heart was not pumping when that shot was fired.

DEFENDANT'S VERSION
Defendant testified that before going to the Browning residence he went by a pawn shop in Jackson, picked up his pistol and then went to look at a lot located near Browning's trailer that he was interested in buying. As he passed Browning's trailer, Browning stopped him and asked where his drinking whiskey was, and defendant replied that he did not have any whiskey. Browning asked defendant to take him to Jackson so that he could buy some. Since neither Browning nor his wife had enough money to buy the alcohol, defendant loaned Browning ten dollars. Browning and defendant bought whiskey in Jackson and then returned to the Browning trailer. Browning insisted that defendant go in, and defendant agreed, saying he could not stay very long. The two men went inside and sat down at the dining room table as Mrs. Browning gave them glasses and Coca-Colas which they used to pour themselves each a drink.
While Mrs. Browning watched television, Mr. Browning attempted to engage defendant in an argument by accusing him of being responsible for his being fired. Defendant denied the accusation and told Browning that he would have to leave. Browning then quit arguing and told defendant to sit down, but he soon resumed the argument. Defendant asked Mrs. Browning whether she had explained to Mr. Browning that defendant had had nothing to do with his being fired, and she replied that she had but her husband was hardheaded. Browning then told his wife to shut up and stay out of it, and Mrs. Browning left.
Defendant then asked Mr. Browning if he could use his bathroom. Browning pointed the way and then followed him. When defendant came out of the bathroom, Browning, standing to defendant's left in the bedroom, said, "Clingon, I am going to kill you." Defendant replied, "No, no, Browning." Browning fired a shotgun, and the blast knocked defendant down against the outside wall which was across from the bathroom. As Clingon started to get up, Browning was still pointing the shotgun at him, and Clingon pulled his gun out of his coat and started firing, because he thought his life was in danger. He fired rapidly three times while the shotgun held by Browning was about three feet from his body. Browning was in a standing position when defendant fired at him, and he thought Browning reeled a little after he shot him, although he did not know whether he hit him. The holes in defendant's shirt and jacket were caused by the shotgun blast. He did not shoot Browning when Browning was down.
Defendant denied he had threatened to kill Browning prior to the shooting. He denied that Browning's daughter was in the trailer while he and Browning were arguing. He denied that he was drunk and that Browning had told him to leave. Defendant also denied that he asked the deputy sheriff at the jail, "Are you bastards going to take me to the hospital?" He denied having told the nurse to get up on the stretcher with him.

THE CONTRADICTIONS
The Weathersby rule is unavailable if defendant's version is unreasonable, or substantially contradicted in material particulars by a credible witness or witnesses for *826 the state, or by the physical facts, or facts of common knowledge. The defendant's version is contradicted in the following respects:
1. The wife of deceased testified that when the defendant asked her husband to go with him to get some whiskey, Browning refused, but defendant insisted until he agreed. It was defendant, not Browning, who started the argument. Defendant became intoxicated, and Browning asked him to leave. Defendant insisted that Browning admit that he remembered something they were arguing about, and Browning insisted that he did not remember. Whereupon defendant told Browning, "Don't say that you don't remember, or I might kill you."
2. The daughter of the deceased stated that the defendant persisted in needling Browning and that when defendant got up from the table where he and Browning had been drinking, he staggered, had trouble speaking, and in her opinion was drunk.
3. J.B. Torrence, Sheriff of Rankin County, testified that when he saw the defendant at his office the defendant was drunk. Two days after the shooting, defendant told Torrence that he hated that he had to kill the man but that Browning was standing at the dining room table reaching for his gun when he shot him.
4. Jack Smith, an investigator for the Highway Patrol, stated that when defendant came to the Rankin County Jail he said, "Are you bastards going to carry me to a doctor or hospital?" The defendant was intoxicated at that time. Two days after the incident, defendant told Smith that he hated to shoot the man after he was down but that he was attempting to load the shotgun when defendant shot him. Defendant told Smith that he and Browning were sitting at the table in the dining room, which is at the opposite end of the trailer from the bedroom. When defendant got up to go to the bathroom and when he emerged from the bathroom, Browning was still at the dining room table and fired the shotgun at him.
5. A.B. Martin, a deputy sheriff of Rankin County, testified that when defendant came to the jail after the shooting, he was drunk.
6. Ken Dickerson, a deputy sheriff of Rankin County, testified that when he saw defendant after the shooting, the defendant was drunk. After defendant went to the hospital, defendant told him that he hated to shoot the man while he was down but that Browning was trying to reload the gun.
7. Kenneth Warren, deputy sheriff of Rankin County, testified that while at the hospital following the shooting, defendant said, "I hated to shoot him while he was down, but he kept trying to get up and reload the gun."
8. Mrs. Margaret Ainsworth, a registered nurse at the Rankin General Hospital, who was on duty when Clingon was brought to the emergency room, testified that defendant was in an intoxicated condition and asked her if she would like to climb upon the stretcher with him. She stated that defendant said that he hated to shoot the man when he was down, but that he had gone for his gun.
The foregoing contradictions involved material particulars and were made by credible witnesses for the State.
Defendant went to the home of deceased armed with a loaded pistol. The jury was justified in finding that he became drunk and precipitated the argument with the deceased; that he gave three different versions of the shooting: (1) that Browning was in the dining room when Browning shot at him with the shotgun (obviously not true from the physical facts), (2) that he shot Browning when Browning was down, and (3) that he shot Browning when Browning was standing in the bedroom. Considering all of the evidence, including the contradictions noted herein, we hold *827 that the Weathersby rule is not available to the defendant in this case and that the question of his guilt was for the jury. Cowart v. State, 270 So.2d 350 (Miss. 1972).
Defendant assigns as error the giving on behalf of the state of instruction No. 6, which is similar to the one given in Patterson v. State, 289 So.2d 685 (Miss. 1974). This instruction is concerned with malice aforethought, which is an element of murder but not of manslaughter. Defendant was not convicted of murder, and, therefore, the giving of the instruction is not reversible error insofar as the question of malice aforethought is concerned. The instruction in question does not have the vices that resulted in the reversal of Nicholson v. State, 243 So.2d 552 (Miss. 1971), because in Nicholson the state's instruction was focused on the plea of self-defense. The instruction in the case at bar uses the phrase "and not in necessary self-defense, real or apparent," not in a manner to advise the jury concerning that defense, but merely to avoid cutting off that defense. The defendant received ample instructions setting out his claim to self-defense, perhaps considerably more liberal than he was entitled to under the law. Therefore, we find no reversible error in the giving of state's instruction No. 6.
The next question raised is the contention that the verdict is contrary to the law and the evidence. The thrust of defendant's argument is that he acted in necessary self-defense, and that there is no evidence to the contrary. This is discussed in the first question raised, and we find no merit in this assignment of error.
Finally, defendant says that the trial court erred in allowing the state to introduce pictures depicting the body of the deceased, because such pictures served no other purpose than to prejudice and inflame the jury. The pictures show the location of the wounds in a manner that would be difficult to describe orally. We are of the opinion that these photographs served a useful evidentiary purpose in this case. Moreover, the introduction of such evidence is within the sound discretion of the trial judge. Ford v. State, 227 So.2d 454 (Miss. 1969).
Affirmed.
PATTERSON, INZER, SUGG and BROOM, JJ., concur.